IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

CHARLES SHEPPARD,

|  |  |  |
|---|---|---|
| | Plaintiff, | OPINION and ORDER |
| v. | | 18-cv-896-wmc |

JOLINDA WATERMAN,
BETH EDGE, KAREN LEE,
and SANDRA MCARDLE,

Defendants.

*Pro se* plaintiff Charles Sheppard is a prisoner at the Oshkosh Correctional Institution, who was granted leave to proceed on Eighth Amendment and state law claims against four Wisconsin Secure Program Facility ("WSPF") employees for terminating his long-standing pain prescription and failing to respond to his subsequent reports of withdrawal symptoms.  (Dkt. #6.)  In particular, the court granted Sheppard leave to proceed against:  (1) Health Services Unit Manager ("HSM") Jolinda Waterman for allegedly terminating Sheppard's pregabalin prescription without cause; (2) Nurses Beth Edge and Karen Lee for allegedly responding to Sheppard's report of withdrawal symptoms with deliberate indifference; and (3) Nurse Practitioner Sandra McArdle for terminating his pain prescription *and* failing to treat his subsequent withdrawal symptoms.  Defendants Jolinda Waterman, Karen Lee and Beth Edge are represented together by the Wisconsin Department of Justice and will be referred to as the "State Defendants," while defendant Sandra McArdle is represented separately.

Now before the court are the State Defendants' and McArdle's motions for summary judgment (dkt. ##83, 78), and plaintiff Sheppard's motion for recruitment of

counsel (dkt. #103).   Because no reasonable jury could conclude that the State Defendants' involvement in the termination of Sheppard's pregabalin prescription and subsequent treatment of his withdrawal symptoms amounted to a constitutional violation, the court will grant their motion for summary judgment with respect to Sheppard's Eighth Amendment claims, and relinquish supplemental jurisdiction over Sheppard's state law claims against them.   However, the court will deny McArdle's separate motion for summary judgment, since a reasonable fact-finder could infer that she failed to exercise medical judgment in terminating plaintiff's pregabalin, and in handling his subsequent reports of withdrawal symptoms and severe pain.   Finally, since the claims proceeding to trial against McArdle may require expert testimony, the court will grant Sheppard's motion for recruitment of counsel.

## UNDISPUTED FACTS[1]

### A.  Defendants' roles and responsibilities

Plaintiff Charles Sheppard was incarcerated at WSPF during all times relevant to this lawsuit.   Defendant Jolinda Waterman, a licensed and registered nurse, worked as WSPF from January 11, 2015, until May 2019, when she retired.   As HSM, Waterman's managerial duties including helping develop procedures, monitoring care plans, preparing reports, and acting as a liaison between other WSPF units and disciplines, as well as

---

[1]  Unless otherwise noted, the following facts are material and undisputed.   The court has drawn these facts from the parties' proposed findings of fact and responses, as well as the underlying evidence submitted in support, all viewed in a light most favorable to plaintiff as the non-moving party.

between outside providers and the institution.  She also provided administrative support to WSPF's Health Services Unit ("HSU") staff and worked with WSPF's advanced care providers, including physicians, nurse practitioners/prescribers and physician assistants. Due to her administrative position at WSPF, Waterman attests that she did *not* evaluate, diagnose, treat or prescribe medications for inmates.[2]

Waterman further attests that neither she nor the nursing staff prescribe medications, make referrals, or approve treatment recommendations made by offsite providers.  Rather, advanced care providers are responsible for final treatment decisions and care plans, including writing prescriptions, making offsite referrals, and approving treatment recommendations by offsite providers.  For that reason, Waterman and nursing staff deferred to medical decisions made by advanced care providers, and they did *not* have the authority to override or alter a medical decision.  That said, Waterman acknowledged that if nursing staff believed that an advanced care provider's decision endangered an inmate's life, nursing staff could report that information to Waterman in her role as HSM, at which point Waterman could take that information up the chain of command within the institution and, if necessary, even to the Wisconsin Department of Corrections' Central Office.

---

[2] Sheppard disputes this, declaring that:  "[o]ne time she called me to an exam room and had me take off my shoes and examine my feet and personal shoes.  Another time she came to the unit and passed out medication to me."  (Sheppard Decl. (dkt. #100) ¶ 17.)  The court accepts that Sheppard's statements in his declaration create a genuine dispute as to whether Waterman performed services akin to a nurse clinician at times, but his specific examples do not support an inference that Waterman evaluated, diagnosed, treated or prescribed medications for inmates.

As nurse clinicians, Registered Nurses Beth Edge and Karen Lee are responsible for patient assessment and treatment, assisting physicians in providing medical services, medication management, and providing emergency care and maintenance of medical records. Finally, defendant Sandra McArdle worked at WSPF in her capacity as an Advanced Practice Nurse Practitioner ("APNP") during the relevant time period, but is no longer employed there.

**B. Sheppard's alleged misuse of medication**

At least as of August of 2018, Sheppard had been prescribed pregabalin to treat his severe case of diabetic neuropathy. The record does not reveal the exact length of time Sheppard had been prescribed pregabalin, nor his exact dosage, but Sheppard declares, and the court will accept at least for purposes of summary judgment, that he had been taking that pain medication for a long time.

On August 7, 2018, WSPF Correctional Officer ("CO") Morris informed a non-defendant nurse (Drone) that he had found a medication on Sheppard's bed. Drone advised Morris to complete an incident report and to bring the medication to HSU for identification. After receiving the medication from WSPF Sergeant Feddie, Nurse Drone identified it as pregabalin, which is designated by the HSU as a controlled substance. At that time, Drone specifically noted that the HSM and advanced care provider on shift would be notified that the medication had been found in Sheppard's cell.

Shortly after Drone's note, defendant McArdle, as APNP, also noted that the pill found by security indeed was pregabalin, writing in both Sheppard's progress notes and

the "prescriber's orders" to discontinue Sheppard's prescription for pregabalin due to inappropriate use. (*See* dkt. #90-1, 7, 11.)[3]

Although McArdle's notation is undisputed, Sheppard disputes her interpretation that he was misusing pregabalin. Instead, Sheppard maintains that when CO Morris dispensed his pregabalin that day, he told Morris that he was having trouble swallowing and would save the pill in his cell for a later point when he had more water. Although acknowledging that DOC policy prohibits inmates from misusing controlled medications such as pregabalin, Sheppard further points out that he never received a conduct report for misusing medication. However, the evidence of record does not indicate that APCP McArdle was made aware of Sheppard's explanation at the time she made the note to his file.

A few hours later, Sheppard was apparently being examined by a Dr. Patterson for an unrelated matter, when HSM Waterman was called into the exam room. By that time, Sheppard had learned that his pregabalin was being discontinued, and he was upset. Sheppard explained to both Waterman and Patterson that he had told CO Morris about choking on his pregabalin, after which he took his other officer-controlled medications but kept the pregabalin to take with more water later. Sheppard also told them that he then went to breakfast, and when he came back the pill was gone, having been taken to HSU for identification.

---

[3] Defendants refer to these records as "Exhibit 1002," in their submissions, but the exhibit itself is labeled "Exhibit 1001." To avoid further confusion, the court will simply cite to the correct docket entry number of 90.

Manager Waterman and Sheppard provide different versions of what was discussed next.  According to Waterman, Dr. Patterson and she discussed with Sheppard that (1) he had not reported any difficulty swallowing his pregabalin to nursing staff, and (2) the capsule had not appeared to have been exposed to saliva.  She also reports reminding Sheppard that pregabalin is a federally controlled substance that requires actual ingestion, and his mouth check that day had been completed without him reporting any difficulty swallowing during the nurse medication pass.  Waterman claims that Sheppard then changed the subject, asking about his HSU shoes, which had already been addressed during his exam by Dr. Patterson.

For his part, Sheppard maintains that Morris, not nursing staff, dispensed his medication that day, explaining the absence of a note from nursing staff.  He also states Dr. Patterson and HSM Waterman never said anything to him about failing to tell nursing staff that he had difficulty swallowing.  Sheppard further maintains that if they *had* brought it up, he would have explained the absence of a nurse during medication rounds, that Morris observed him, and that he *did* report issues swallowing the pregabalin.  (Sheppard Decl. (dkt. #100) ¶ 18.)

As HSM, Waterman attests that when a patient and provider disagree about discontinuing a medication -- especially a federally controlled substance like pregabalin -- the HSU manager is required to consult with the DOC Medical Director.[4]  In accordance

---

[4] Waterman emphasizes that decisions involving prescriptions for pregabalin require this level of rigor because the DOC has designated it as a "non-formulary" medication.  Non-formulary medications are only prescribed when alternate formulary medications have been proven to not be effective for the patient or are contraindicated.  Depending on the medication requested, non-formulary requests are reviewed on a case-by-case basis, by either the psychiatry director, the

with that policy, Waterman also attests that she called Dr. Paul Bekx, the DOC's Medical Director at the time, to discuss the discontinuation of Sheppard's pregabalin specifically. Waterman further attests that when she explained what happened that day with Sheppard's pregabalin, Dr. Bekx agreed with APNP McArdle's decision to discontinue Sheppard's pregabalin due to misuse.  Nurse Waterman next added a note about her conversation with Dr. Bekx to Sheppard's progress notes.  (Dkt. #90-1) 8.)  Waterman attests that McArdle also reviewed her incident report memorializing the discovery of the pregabalin pill in Sheppard's cell, and that she made the decision to discontinue the pregabalin as supported by Dr. Bekx.  (Waterman Decl. (dkt. #87) ¶ 25.)  Because of Dr. Bekx's approval, Waterman did not view that decision as problematic.

Similarly, APNP McArdle explains that when an inmate misuses a controlled medication, it is "automatically" terminated under DOC policy.[5]  In her declaration, McArdle opines that cessation of pregabalin can result in mild to moderate symptoms for about a week, but that the length of time someone takes the medication does not affect the length and severity of symptoms, and that Sheppard's subsequent report of withdrawal symptoms could have been caused by his increased neuropathic pain, rather than withdrawal from pregabalin.  Regardless, Sheppard disputes that his symptoms were mild to moderate, claiming that his withdrawal symptoms were severe.  He also cites an

_____

associate medical director, or the medical director.  Pregabalin in particular is considered a non-formulary medication because it has a high potential for abuse or misuse in the correctional setting. Since the DOC has seen a high incidence of diversion; it is not uncommon for inmates to hoard it, later taking larger doses all at once or sharing it with other inmates.

[5]  Although Sheppard points out that he has seen other inmates misuse medications without penalty, he does not specifically deny the existence of this general policy.

informational packet for pregabalin that he received during the course of discovery, cautioning that withdrawal symptoms "may occur more commonly or severely if you have been taking this medication for a longer period of time."  (*See* Ex. 4 (dkt. #100-4) 2.)

### C. Sheppard's complaints of withdrawal symptoms to HSU

When an inmate has a concern that he wishes to communicate with medical staff, he may fill out a Health Service Request ("HSR") form and submit it to the HSU.  HSRs are then triaged by nursing staff, using their training and judgment to prioritize appointments and inmate needs.  Once nursing staff has triaged and responded to an HSR, it is placed in the inmate's request folder portion of his medical report.  A response form includes multiple boxes that HSU staff can check to indicate whether:  the inmate is scheduled to be seen; the HSR has been referred to another staff member; the HSR has been referred for copies or a record review; or education materials are attached.  There is also space on the form for the responding HSU staff member to provide an additional written comment.

Although an HSR may be directed to the HSM, HSRs always are triaged in the same manner for patient care and safety.  Indeed, an HSR placed in a pile for a particular staff member may contain a request for emergent care that cannot wait.  That is why any HSR Sheppard directed to HSM Waterman specifically would still have been first reviewed by nursing staff responsible for triaging HSRs on that day.

On August 10, 2018, Sheppard was experiencing what he believed were painful withdrawal symptoms.[6]  Therefore, he submitted an HSR reporting that "as a result of the abrupt cessation and discontinuation of my Lyrica medication the effects included but aren't limited to headaches, muscle aches, and pains, dizziness, depression, nausea, stomach cramps, excessive sweating, and insomnia . . ." (Sheppard Decl. (dkt. #100) ¶ 7.) Nevertheless, Sheppard attests that he was not called to the HSU that day.  Instead, a note on the HSR indicates that an HSU staff member forwarded it to a provider for review, and that three days later, on August 13, APNP McArdle wrote in the response section of that HSR that any withdrawal symptoms Sheppard was experiencing would subside with time. (Sheppard Decl. Ex. 3 (dkt. #108-1) 1.)  McArdle also recorded her response in Sheppard's progress notes.  (Dkt. #90-1, at 6.)  Although not noted in the HSR response, that day McArdle also entered an order for tramadol.  (Reid Decl., Ex. A (dkt. #82-1) 6.)  However, McArdle did not personally examine or speak with Sheppard that day.

Instead, on that day, Sheppard underwent a colonoscopy and fistulotomy off-site. When he returned to WSPF on August 13, Sheppard then met with Nurse Edge. Defendant Edge wrote in Sheppard's progress notes that she reviewed the recommendations from the off-site provider with Sheppard, and that she ensured he understood.  (Dkt. #90-1, at 6.)  Among those recommendations was that Sheppard

---

[6] The record does not reveal exactly when Sheppard's withdrawal symptoms started, but it appears they may have begun on August 9 or 10, 2018.  The record tracking Sheppard's pregabalin prescription distribution indicates that although the prescription was terminated on August 7, Sheppard received doses on August 7 and 8, which Sheppard does not dispute.  (Reid Decl., Ex. A (dkt. #82-1) 5.)  The next day, August 8, 2018, Sheppard underwent a routine blood test to check his blood level for pregabalin.  That test result showed a "7," which APNP McArdle explains showed consistent use of pregabalin, but not necessarily that it had been taken as prescribed.

receive Tylenol and ibuprofen for his pain.  (*See* dkt. #82-1, at 6.)  Edge further noted that Sheppard requested extra pads to keep in his underwear in case blood seeped out. According to Edge, she also forwarded the off-site provider's recommendations to Sheppard's advanced care provider, and then Sheppard left with his wheeled walker without incident.

During this interaction, Nurse Edge does not recall Sheppard complaining of withdrawal from pregabalin, but Sheppard declares that he specifically told her about his suffering from "very painful withdrawal symptoms."  (Sheppard Decl. (dkt. #100) ¶ 14.) In reply, Edge states that *if* Sheppard had brought up withdrawal symptoms, she would have noted it in the treatment records; and even if Sheppard brought up the withdrawal symptoms, she would not have been able to prescribe medications.  Instead, she would only have been able to treat symptoms associated with withdrawal.[7]

On August 14, 2018, Sheppard reported to the HSU with complaints of drainage from the procedures he underwent the day before, specifically requesting pads to prevent drainage from getting on his pants, which defendant Lee provided.  Sheppard also complained that his pain was now a 10 out of 10, and he could not take the pain medication he had been prescribed (tramadol) because it made him nauseous.  Nurse Lee responded by directing Sheppard to take ibuprofen and Tylenol as needed, reminding him to take daily showers to keep the area clean, and she offered him ice, which he refused. Further, Lee also instructed Sheppard to submit an HSR to discuss his medications. Finally, Lee does not recall Sheppard mentioning that his pain was associated with

---

[7]  Edge does not attest whether she was aware of McArdle's separate order for tramadol.

withdrawal symptoms, which she would have noted and addressed if Sheppard had raised them.

On August 14, 2018, Sheppard submitted another HSR, complaining that he could not take tramadol because it makes him vomit.  The next day, August 15, APNP McArdle prescribed Sheppard Tylenol #3 because the tramadol had been making him nauseous. On August 23, McArdle personally examined Sheppard for his complaints of increased neuropathic pain because his pregabalin was discontinued.  McArdle decided to try Topamax in place of the pregabalin, and to order a follow-up with an orthopedic surgeon to address Sheppard's ongoing hip pain.  McArdle also explains that this appointment was the earliest date the surgeon could see him in person.

On September 17, 2018, Sheppard complained that he was experiencing nausea from the Topamax, prompting McArdle to discontinue it.

On October 30, 2018, Dr. Patterson examined Sheppard for his complaints of increased neuropathic pain since the discontinuation of his pregabalin.  Dr. Patterson felt it was appropriate at that point to request an approval to restart Sheppard on pregabalin. After that request was approved, Dr. Patterson wrote a new prescription on November 8, 2018.

There is no dispute HSM Waterman reviewed all of the HSRs that Sheppard submitted from August to November 2018, although Waterman attests that she did not personally receive or review any HSR Sheppard submitted during the actual period in which he was complaining about withdrawal symptoms or neuropathic pain.

11

### D. Notice of Claim

Sheppard has not served any notices upon the Attorney General's Office with regard to the claims in this lawsuit.

OPINION

Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the moving party meets this burden, then the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party." *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406–407 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)) (brackets omitted). While disputed facts are viewed in a light most favorable to the plaintiff as the non-moving party, this treatment does not extend to inferences supported merely by speculation or conjecture. *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017); *Coleman v. City of Peoria, Ill.*, 925 F.3d 336, 345 (7th Cir. 2019). All of the defendants seek judgment in their favor, but since the State Defendants and McArdle's arguments differ, the court addresses them separately.

## I.   State Defendants

### A. Deliberate Indifference

The Eighth Amendment gives prisoners the right to receive adequate medical care, *Estelle v. Gamble*, 429 U.S. 97 (1976). To prevail on a claim of constitutionally inadequate medical care, an inmate must prove that: (1) he had an objectively serious medical need;

12

and (2) a state official acted with deliberate indifference to that need.  *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019); *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). For purposes of summary judgment, the parties do not dispute that plaintiff's need for pain medication and subsequent reported withdrawal symptoms posed a serious medical condition.  Rather, the State Defendants argue that their involvement in the cancellation of plaintiff's pregabalin and responses to his reports of withdrawal does not rise to deliberate indifference.

In the prison setting, "deliberate indifference" requires proof that an official was aware an inmate faced a substantial risk of serious harm but disregarded that risk by consciously failing to take reasonable measures to address it.  *Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997).  Thus, an inmate must prove *more than* negligent acts, or even grossly negligent acts, but something less than *purposeful* acts.  *Farmer v. Brennan*, 511 U.S. 825, 836 (1994).  More specifically, the threshold for deliberate indifference is met where:  (1) "the official knows of and disregards an excessive risk to inmate health or safety"; *or* (2) "the official [is] both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," *and* he or she draws that inference yet deliberately fails to take reasonable steps to avoid it.  *Id*. at 837; *see also Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) ("While evidence of malpractice is not enough for a plaintiff to survive summary judgment on an Eighth Amendment claim, nor is a doctor's claim he did not know any better sufficient to immunize him from liability in every circumstance."); *Burton v. Downey*, 805 F.3d 776, 785 (7th Cir. 2015) ("the infliction of suffering on prisoners can

be found to violate the Eighth Amendment only if that infliction is either deliberate, or reckless in nature in the criminal sense").

For example, a reasonable jury may "infer deliberate indifference on the basis of a physician's treatment decision [when] th[at] decision [is] so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006). Accordingly, "[a] prisoner may establish deliberate indifference by demonstrating that the treatment he received was 'blatantly inappropriate.'" *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (citing *Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005)).

### 1. Waterman

The State Defendants seek summary judgment as to defendant Waterman because as Health Services Unit Manager, she was neither responsible for terminating plaintiff's prescription, nor had authority -- either as a nurse or as the HSM -- to terminate plaintiff's pregabalin prescription. Waterman further maintains none of the information provided to her would permit a reasonable jury to infer that she had a valid basis to question Nurse Practitioner McArdle's and Dr. Bekx's judgment with respect to the termination decision. Finally, Waterman contends that she cannot be held liable for plaintiff's subsequent complaints of withdrawal symptoms in his HSRs because she was not aware that he was submitting those complaints.

In opposition, plaintiff insists that in her capacity as HSM, Waterman had provided him medical care on other occasions, and with respect to the August 7, 2018, termination of his pregabalin, she was sufficiently involved to be found liable. Plaintiff further argues

that Waterman would have been aware of the HSRs complaining about his withdrawal symptoms.

As an initial matter, plaintiff's attesting that Waterman had been involved in providing him limited medical care at some point in the past does *not* permit a reasonable inference that she had the authority to terminate his pain prescription, much less that she actually did so.  In particular, plaintiff attests that Waterman once examined his foot, and on another occasion, she dispensed a medication to him.  However, plaintiff does not submit evidence contradicting Waterman's assertion that, as either HSM or a nurse, she lacked the authority to prescribe or terminate a prescription such as pregabalin. Accordingly, the court accepts as undisputed that Waterman lacked the authority to terminate that prescription.

However, that does not end the analysis.  Certainly, as the HSM and a nurse, Waterman was entitled to defer to the judgment of plaintiff's advanced care providers McArdle and Bekx, but she acknowledges that her duties including reporting dangerous decisions within the institution and, if necessary, up the chain within the DOC.  *Rice ex rel Rice v. Correctional Med. Servs.*, 675 F.3d 650, 683 (7th Cir. 2012) (nurses are entitled to rely on judgment of physicians but may "not unthinkingly defer to physicians and ignore obvious risks to [an inmate's] health").  Still, plaintiff has offered no evidence that would permit a reasonable jury to infer Waterman had a reason to question McArdle's judgment in terminating plaintiff's prescription.

Waterman's first involvement in the events of August 7, 2018, came a few hours after the CO's discovery of the pregabalin pill and McArdle's decision to discontinue

plaintiff's prescription, when she joined an appointment in progress between Dr. Patterson and plaintiff.  Waterman acknowledges that plaintiff was upset about McArdle's decision to terminate his prescription for pregabalin, and does not dispute that plaintiff explained his defense for not taking the pill:  he had told Morris he was choking, the pill had come back up, and he was saving it to take with more water.  To the contrary, Waterman's contemporaneous notes memorializing the exchange between Dr. Patterson, plaintiff and her includes plaintiff's assertion that he had choked up the pill and was saving it to take with water.  (Dkt. #90-1, 8.)  However, plaintiff does not dispute that Patterson and Waterman noted that the pill reportedly had no saliva on it.  Nor is there a dispute that Waterman followed up with the two individuals who *had* the authority to terminate plaintiff's prescription, initially speaking to Dr. Bekx to relay the reason for McArdle's decision and plaintiff's disagreement, and because Dr. Bekx agreed with McArdle's decision to terminate the prescription, next having McArdle review the incident report.

Having conferred with both of plaintiff's advanced care providers, Waterman was entitled to defer to their judgment regarding discontinuing the pregabalin prescription.  *See Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1075-76 (7th Cir. 2012) (nurse is entitled to rely on a doctor's instruction unless it's obvious that the doctor's advice will harm the prisoner); *Berry v. Peterman*, 604 F.3d 435, 443 (7th Cir. 2010) (a nurse's "deference may not be blind or unthinking, particularly if it is apparent that the physician's order will likely harm the patient").  Moreover, plaintiff has not pointed to any evidence suggesting that Waterman genuinely believed that plaintiff had not misused the pregabalin that day, or would be at risk if his prescription were discontinued, much less failed to voice those beliefs.

16

In fairness, since Waterman attests that she deferred to McArdle's judgment because Dr. Bekx concurred, it is *conceivable* that Waterman might be held accountable if evidence of record suggested that the information she provided Bekx during their August 7, 2018, telephone conversation was inaccurate.  However, plaintiff does not pursue this theory, and in any event the evidence of record would not support such a finding.

As for plaintiff's subsequent request for relief from his purported withdrawal symptoms or increased pain, no evidence suggests that Waterman was aware that he was experiencing symptoms requiring medical attention.  To be held liable under § 1983, a plaintiff must prove the defendant's *personal* participation or *direct* responsibility for the constitutional deprivation.  *Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018) (citing *Wilson v. Warren Cty.*, 830 F.3d 464, 469 (7th Cir. 2016)).  In particular, "a plaintiff must show that the defendant '*actually* knew of and disregarded a substantial risk of harm.'" *Id.* (quoting *Petties*, 836 F.3d at 728).

Similarly, "[s]ection 1983 does not establish a system of vicarious responsibility. Liability depends on each defendant's knowledge and actions, not on the knowledge or actions of persons they supervise." *Burks v. Raemisch*, 555 F.3d 592, 593-94 (7th Cir. 2009) (citation omitted).  Thus, "for a supervisor to be liable, they must be 'personally responsible for the deprivation of the constitutional right.'" *Matthews v. City of East St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012) (quoting *Chavez v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001)).  In particular, the supervisor must "'know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see.'" *Id.* (quoting *Jones v. City of Chicago*, 856 F.2d 985, 992-93 (7th Cir. 1988)).

17

Plaintiff does not dispute Waterman's assertion that she did not review his HSRs complaining of painful withdrawal symptoms, but rather they were screened by an assigned triage nurse on the date of receipt. As such, no reasonable jury could find Waterman personally responsible for plaintiff's post-August 7 complaints about subsequent pain or other withdrawal symptoms. Accordingly, Waterman is entitled to summary judgment in her favor on the merits of plaintiff's deliberate indifference claim against her.[8]

### 2. Nurses Edge and Lee

Defendants also seek judgment as to Nurses Edge and Lee because neither defendant had the authority to override McArdle's decision to terminate plaintiff's pregabalin, and no evidence suggests that either consciously disregarded plaintiff's need for medical attention. In opposition, plaintiff maintains that both Edge and Lee failed to respond to his complaint of withdrawal symptoms.

Starting with Edge, her first involvement with plaintiff came on August 13, although it is undisputed that even then, she did not specifically treat or record plaintiff's complaint about withdrawal symptoms. Moreover, Edge does not recall plaintiff complaining about withdrawal symptoms. Of course, for purposes of summary judgment, the court accepts as true that: (1) plaintiff reported to Edge that he was suffering from withdrawal symptoms on August 13; and (2) Edge did not address those specific symptoms in her treatment that day.

---

[8] In light of this ruling, the court will not address Waterman's alternative qualified immunity argument.

18

Even so, the totality of Edge's care for plaintiff on August 13 does not support a reasonable inference of deliberate indifference.  First, there is no dispute that Edge was seeing plaintiff upon his return from multiple, off-site procedures (a colonoscopy and fistulotomy), and it is further undisputed that Edge reviewed the recommendations from the off-site provider with him, which included access to Tylenol and ibuprofen for his pain. Edge also ensured that plaintiff received extra pads to address potential leakage.  Even assuming, as the court must, that during this interaction, plaintiff reported he was suffering from "very painful withdrawal symptoms" (Sheppard Decl. (dkt. #100) ¶ 14), plaintiff has not attested that he complained that he had already taken the Tylenol and ibuprofen already prescribed for his pain and those medications had been ineffective.

Even if the court assumes for purposes of summary judgment that plaintiff had been more specific, *and* conveyed that Tylenol and ibuprofen were inadequate to alleviate them, there is also no dispute that Edge lacked the authority to prescribe plaintiff any additional medications, just as did Waterman.  As such, the only additional step Edge could have taken on August 13 would have been to forward plaintiff's complaints to an advanced care provider (likely, APNP McArdle), who had on *that very day*, prescribed him a new pain medication (tramadol) in response to his complaint of withdrawal symptoms.  On this record then, there appears little more Edge could have done to alter the treatments available to plaintiff.  Indeed, as previously discussed, she was bound by McArdle's judgment absent an obvious act of malpractice.  Accordingly, on this record the court cannot conclude that Edge's failure to specifically address plaintiff's withdrawal symptoms on August 13 could support a finding of deliberate indifference.

19

Similarly, Nurse Lee first interacted with plaintiff the following day, August 14, for the purpose of discussing pain associated with his just completed colonoscopy and fistulotomy. During their interaction, it is undisputed that plaintiff rated his pain as a 10 out of 10, and he complained that the new tramadol prescription was making him nauseous. Plaintiff further claims that he specifically reported to Lee that he was suffering from withdrawal symptoms, and Lee responded by directing him to take Tylenol and ibuprofen for his pain and submit an HSR about the tramadol. Like Nurse Edge, it is also undisputed that Lee did *not* have the authority to prescribe plaintiff any medications, much less restart his pregabalin prescription, so her inclination to direct him to submit an HSR about pain medications, was not certainly patently inappropriate. Further, Lee did not leave him without *any* pain medications that day, since she encouraged plaintiff to take the Tylenol and ibuprofen still available to him.

Of course, in that moment, Lee could have taken the additional step of alerting an advanced care provider that plaintiff could not take tramadol, but the Eighth Amendment does not require medical staff to provide the best or most prompt case possible. To the contrary, as previously explained, "[n]egligence, gross negligence, or even 'recklessness' as that term is used in tort cases, is not enough." *Burton*, 805 F.3d at 785 (quoting *Shockley v. Jones*, 823 F.2d 1068, 1072 (7th Cir. 1987)); *see also Hildreth v. Butler*, 960 F.3d 420, 426 (7th Cir. 2020) ("the prison officials' state of mind must rise to the level of deliberate indifference."). Moreover, Lee's advice that day proved effective: after submitting an HSR complaining that tramadol made him vomit that same day, Nurse Practitioner McArdle responded by terminating the tramadol prescription and started him on Tylenol #3 the

very next day.  Although plaintiff claims that Lee did not address plaintiff's withdrawal symptoms head-on, a reasonable jury would have to find that Lee responded directly, promptly and in apparent good faith to plaintiff's report that his pain level was at its maximum and the tramadol was ineffective.  However, this response may have fallen short of ideal, it does not support a finding that she consciously disregarded his reports of pain or withdrawal.

### B.    State law claims

The State Defendants also move to dismiss plaintiff's state law claims against all of them for lack of subject matter jurisdiction because plaintiff failed to comply with Wisconsin's notice of claim statute, Wis. Stat. § 893.82.  In particular, since Waterman, Edge and Lee were each state-employed nurses, defendants argue that Wisconsin's medical malpractice statute does not apply to them, and these claims are governed by Wisconsin's notice of claim requirements, citing *Smith v. Hentz*, No. 15-cv-633-jdp, 2018 WL 1400954, at *1-3 (W.D. Wis. Mar. 19, 2018) (citing *Lamoreux v. Oreck,* 2004 WI App 160, ¶ 50, 275 Wis. 2d 801, 828, 686 N.W.2d 722, 735 (dismissing medical malpractice action against state employee because plaintiff failed to satisfy the applicable notice of claim requirements in effect at that time)).

Although plaintiff does not respond to this argument, much less suggest that he complied with the notice requirement, the court notes that the statute specifically exempts "medical malpractice" claims from the notice of claim requirements.  *See* Wis. Stat. § 893.82(5m).  Moreover, because plaintiff was challenging the quality of the medical care

21

he received, his claim may be fairly construed as a "medical malpractice" claim falling under that exemption.  While defendants do not acknowledge this exemption, the court need not resolve whether it applies to nurses.  Instead, the court will exercise its discretion to relinquish jurisdiction over plaintiff's supplemental negligence claims against Waterman, Lee and Edge without prejudice.  28 U.S.C. § 1367(c); *see Korzen v. Local Union 705*, 75 F.3d 285, 288-89 (7th Cir. 1996) ("The normal practice is to relinquish jurisdiction over a supplemental claim when the claim is dismissed before trial, but if the supplemental claim is easily shown to have no possible merit, dismissing it on the merits is a time saver for everybody.").  Assuming plaintiff's claims are not otherwise time-barred, a state court is better equipped to address these claims, including the possible application of § 893.82(5m)

## II.    Defendant McArdle

As noted, plaintiff was also granted leave to proceed against APNP McArdle for her decision to terminate the pregabalin prescription, as well as failing to examine plaintiff after he reported severe withdrawal symptoms.[9]  McArdle seeks judgment in her favor as to plaintiff's Eighth Amendment claim because her decision to terminate that prescription was required by DOC policy and because plaintiff cannot prove that the termination of pregabalin caused him injury.  She seeks judgment in her favor as to plaintiff's state law claim because plaintiff has failed to disclose an expert witness to testify about the applicable standard of care.  Plaintiff opposes her motion, arguing that McArdle should not have

---

[9] The court previously granted McArdle's motion for partial summary judgment on plaintiff's claim that McArdle's subsequent Topamax prescription was ineffective, on the ground that plaintiff failed to exhaust his administrative remedies with respect to this claim.  (Dkt. #68.)

terminated his pregabalin without tapering him off the medication, and she refused to examine him when he complained about withdrawal symptoms.  On this record, McArdle is not entitled to summary judgment on either claim.

### A.     Deliberate Indifference

To begin, there is no reasonable basis to question McArdle's decision to terminate the pregabalin prescription on August 7 under a deliberate indifference standard.  The parties do not dispute that McArdle was informed that an officer found a pregabalin pill on a pillow in plaintiff's cell, and that there had been no report that plaintiff had been unable to swallow that pill the morning of August 7.  Plaintiff obviously claims that he purposefully did not take the medication and advised the correctional officer accordingly, but what is material for purposes of determining *McArdle's* possible liability is that she was informed by the same officer and Nurse Drone that plaintiff had not taken his pregabalin as prescribed.  Nurse Practitioner McArdle further explains that when she learns of the misuse of a medication, especially a controlled pain medication such as pregabalin, she is *required* to terminate the prescription, and a failure to take that step could subject *her* to liability.

Given that there is no dispute that McArdle had good grounds to believe and genuinely believed that plaintiff had misused pregabalin, there is no basis for a reasonable jury to find that her decision to terminate the prescription demonstrated a conscious disregard of plaintiff's medical condition.  *See Locket v. Bonson*, 937 F.3d 1016, 1024-25 (7th Cir. 2018) (agreeing that nurse practitioner's substitution of Tylenol 3 for oxycodone

did not suggest deliberate indifference, and instead reflected concern for "risks associated with opioid abuse and substance abuse in prison").  However, McArdle's good faith reason to terminate the pregabalin does not entitle her to judgment as a matter of law, given the problematic manner in which she did so.

First, McArdle cancelled the prescription completely on August 7, without a schedule to taper him off the prescription safely or a plan to prescribe plaintiff another, less problematic pain killer for his pain or other withdrawal symptoms, much less to address plaintiff's ongoing, severe and long-standing diabetic neuropathy.  McArdle suggests that these steps were unnecessary:  she opines that the cessation of pregabalin can result in mild to moderate symptoms for about a week, but that the severity of the symptoms is not linked to the amount of time a person has been taking it.  However, plaintiff asserts that the length of time one takes pregabalin *does* bear on the severity of withdrawal symptoms, citing informational materials he received from the DOC itself.  Further, readily available resources caution that long-term use of pregabalin can result in more acute withdrawal symptoms.  *See* Pregabalin - Drug Summary, https://www.pdr.net/drug-summary/Lyrica-pregabalin-467.8329 ("Because discontinuation symptoms (e.g., restlessness, irritability, nervousness) can occur following abrupt withdrawal of pregabalin, slow tapering after chronic pregabalin treatment is required.") (last visited Feb. 19, 2021).

Although neither sides has come forward with evidence detailing the length of time plaintiff had been prescribed pregabalin, nor his dosage, plaintiff has alleged in his complaint that he had been taking pregabalin "for a very long time" (Compl. (dkt. #1) 1), and persists in that claim on summary judgment (Sheppard Decl. (dkt. #108) ¶ 9.)

Assuming, therefore, that the length of time a person takes pregabalin is relevant to the severity of withdrawal symptoms, McArdle's failure to explain her decision to terminate the prescription without tapering is problematic at best and evidence of deliberate indifference at worst, or at least a reasonable jury might so find.

Second, McArdle maintains that plaintiff cannot show that the termination of pregabalin *caused* his alleged withdrawal symptoms, and in any event, her issuance of an August 13, 2018, tramadol prescription should shield her from a finding of deliberate indifference. McArdle's causation argument actually cuts against her; McArdle speculates that plaintiff's discomfort could be attributed to "routine pain" that he would have experienced without a pain killer. (*See* McArdle Br. (dkt. #79) 6.) But even assuming that plaintiff was experiencing "routine" pain associated with his diabetic neuropathy, McArdle does not explain why she terminated a pain prescription without providing an adequate substitute to address the likely return of severe diabetic neuropathy.

As for McArdle's argument that she prescribed him tramadol on August 13, plaintiff points out that McArdle failed to examine him when she prescribed tramadol, and she chose a medication that made him nauseous. Construing this evidence in a light most favorable to plaintiff, a reasonable jury might infer that even this decision could support an inference of deliberate indifference. Indeed, on one hand, it is possible that an in-person examination would have yielded the same prescription decision and results, but it is also possible that if plaintiff had met with (or even spoken with) McArdle, he could have informed her that he could not take tramadol and she would have been able to provide him another pain reliever sooner. However, McArdle has failed to explain why she declined

to examine him at that time, or prescribe *some* pain relief promptly beyond attesting that August 23 was the "earliest time he could be seen." (McArdle Decl. (dkt. #81) ¶ 13.) As such, a reasonable jury may conclude that McArdle's failure to prescribe an alternative pain killer promptly, or examine plaintiff sooner, prolonged his pain unnecessarily, which would also support an inference of deliberate indifference.

Third, McArdle seeks judgment in her favor on the ground that plaintiff cannot prove McArdle's August 7, 2018, termination of the pregabalin prescription actually caused the symptoms he reported. McArdle points out that because plaintiff has not disclosed an expert who could opine about the cause of plaintiff's symptoms reported on August 10, 2018, his claim must fail. However, the court already explained that McArdle's failure to prescribe plaintiff a substitute pain killer when she terminated the pregabalin could be problematic. In any event, it is undisputed that when plaintiff reported what he believed to be withdrawal symptoms to McArdle, and she credited his report at that time. Setting aside the fact that McArdle has not attested that those symptoms could *not* be associated with withdrawal from pregabalin, the court cannot discount plaintiff's report of the symptoms he actually experienced. *See McKinney v. Office of Sheriff of Whitley Cty.*, 866 F.3d 803, 814 (7th Cir. 2017) ("Our cases for at least the past fifteen years teach that [s]elf-serving affidavits can indeed be a legitimate method of introducing facts on summary judgment. We have tried often to correct the misconception that evidence presented in a 'self-serving' affidavit is never sufficient to thwart a summary judgment motion.") (quotation marks and citations omitted).

However, McArdle does not stop there, having further contended that even assuming plaintiff could prove causation, it was *plaintiff* not McArdle that caused those symptoms, since plaintiff was responsible for misusing the medication.  This argument ignores the question of liability before the jury:  even assuming the loss of pregabalin is plaintiff's fault, whether McArdle failed to exercise medical judgment in the manner in which she terminated the prescription, having done so without simultaneously providing a form of pain relief to stave off likely withdrawal symptoms or address plaintiff's severe diabetic neuropathy.  Since a reasonable jury could conclude that she failed to exercise medical judgment, McArdle is not entitled to judgment as a matter of law as to plaintiff's deliberate indifference claim.

### B.    Wisconsin Negligence

Finally, the court will deny McArdle's motion for summary judgment as to plaintiff's state law negligence claim against her.  McArdle correctly points out that plaintiff failed to disclose an expert with respect to the applicable standard of care for his negligence claim. Under Wisconsin law, however, expert testimony is necessary to establish that relevant standard of care *except* where a layperson could conclude, from common experience, that the plaintiff's injury would not have occurred if the provider had used proper care and skill. *Gil v. Reed*, 381 F.3d 649, 659 (7th Cir. 2004).  McArdle's decision to terminate plaintiff's pregabalin abruptly and her subsequent handling of his withdrawal symptoms would not appear to fall into that exception.  In any event, the court has decided to recruit counsel for plaintiff because it appears that expert testimony may be necessary for him to prove adequately his claims against McArdle.  As such, the court finds there is good cause to

extend the expert disclosure deadline and will afford plaintiff the opportunity to disclose an expert or argue that one is unnecessary, with the benefit of recruited counsel. Accordingly, the court is denying McArdle's motion for summary judgment as to plaintiff's negligence claim against her as well.

## ORDER

IT IS ORDERED that:

1. Defendants Waterman, Edge and Lee's motion for summary judgment (dkt. #83) is GRANTED with respect to plaintiff's Eighth Amendment claims against them. The court relinquishes jurisdiction over plaintiff's supplemental negligence claims against these defendants, which are dismissed without prejudice. Defendants Waterman, Edge and Lee are DISMISSED from this lawsuit.

2. Defendant McArdle's motion for summary judgment (dkt. #78) is DENIED.

3. Plaintiff Charles Sheppard's motion for recruitment of counsel (dkt. #103) is GRANTED.

4. All deadlines in this matter, including the trial date, are STRUCK, to be reset once this court recruits counsel on Sheppard's behalf.

5. Defendants' joint motion to extend (dkt. #120) is DENIED as moot.

Dated this 19th day of February, 2021.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge